IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ERYNN BAUER, etc.,                    )
                                      )
             Plaintiff,               )
                                      )
     v.                               )     No.  09 C 2243
                                      )
MICHAEL J. ASTRUE, Commissioner )
of Social Security,                   )
                                      )
             Defendant.               )

## MEMORANDUM OPINION AND ORDER

Minor Sean Martin Bauer ("Sean"), by his mother and next friend Erynn Bauer ("Bauer"), seeks judicial review pursuant to Social Security Act ("Act") §405(g)[1] of the final decision of Commissioner of Social Security Michael Astrue ("Commissioner") that denied Sean's claim for supplemental security income ("SSI") disability benefits.  Both parties have moved for summary judgment under Fed. R. Civ. P. ("Rule") 56, and Bauer has alternatively moved to remand for further proceedings.  For the reasons stated here, both Rule 56 motions are denied, but Bauer's alternative motion to remand is granted.

## Standard of Review and Applicable Law

This Court reviews the ALJ's decision as Commissioner's final decision, reviewing the legal conclusions de novo (Haynes

---

[1] All further statutory references will take the form "Section --," using the Title 42 numbering rather than the Act's internal numbering.  All 20 C.F.R. references are cited "Reg. §--."  Citations to Bauer's and Commissioner's memoranda take the respective forms "B. Mem.--" and "Comm. Mem.--," while Sean's reply memorandum is cited "B. R. Mem.--."

v. Barnhart, 416 F.3d 621, 626 (7th Cir. 2005)).  Because factual

determinations receive deferential review, courts may not

"reweigh the evidence or substitute [their] own judgment for that

of the ALJ" and will affirm Commissioner's decision "if it is

supported by substantial evidence" (id.).  But as Haynes, id.

further explains, "the ALJ must build a logical bridge from the

evidence to his conclusion."   Hence "[i]f the Commissioner's

decision lacks adequate discussion of the issues, it will be

remanded" (Villano v. Astrue, 556 F.3d 558, 561 (7th Cir. 2009)).


        To be found disabled, a child must meet or equal (either

medically or functionally) the elements of an impairment listed

in Appendix ("App'x") 1 to the Act's implementing regulations

(see Reg. §416.924).  Those regulations create a multistep

analysis for determining disability:

        1.  Commissioner must find that the child was not

        performing substantial gainful activity (Reg. §416.924(b)).

        2.  Commissioner must then determine that the child has

        a severe impairment or combination of impairments (Reg.

        §416.924(c)).

        3.  With a "yes" answer at step 2, the next step is to

        determine whether the impairment meets or equals an

        impairment listed in App'x 1 (Reg. §416.924(d)).

If all three steps have produced "yes" answers, that spells

disability. But if the answer at step 3 is "no," all of the listings must be considered to decide whether the child's functional limitations are equal in severity to the functional limitations in any listings (Reg. §416.924(a)).

That degree of severity requires that the child have "marked" limitations in two domains of functioning or an extreme limitation in one domain (Reg. §416.926a(a)).[2] "Marked" limitations "interfere[ ] seriously" and "extreme" limitations "interfere[ ] very seriously" with "[the] ability to independently initiate, sustain, or complete activities" (Reg. §§416.926a(e)(2) and (3)). If Commissioner finds that the child meets either standard, that alternative determination also means the child is disabled.

## Procedural Background

On September 20, 2006 Bauer filed an application for SSI benefits on Sean's behalf, stating he had suffered from attention deficit hyperactivity disorder ("ADHD") since March 2003 (R. 74, 133-38). That application was denied on January 9, 2007, and upon reconsideration it was again denied on June 20, 2007 (R. 75, 76, 84). Bauer then requested and received a hearing ("Hearing") on April 17, 2008 before Administrative Law Judge ("ALJ") John

---

[2] "Domains of functioning" are (1) acquiring and using information, (2) attending and completing tasks, (3) interacting and relating with others, (4) moving about and manipulating objects, (5) caring for oneself and (6) health and physical well-being (Reg. §416.926a(b)(1)).

Kraybill (R. 88-89, 122-27).  Represented by counsel, Sean

testified during the Hearing, as did Bauer and Dr. Kathleen

O'Brien, a licensed clinical psychologist (R. 13, 59).[3]

ALJ Kraybill's May 27, 2008 decision concluded that Sean was

not disabled under the relevant statutes and regulations and was

thus ineligible for SSI benefits (R. 13-24).  That decision

became Commissioner's once the Appeals Council denied Bauer's

request for review on February 13, 2009 (R. 1-3).  On April 13,

2009 Bauer filed a timely complaint for judicial review.

### Factual Background

Sean was born on March 10, 1996 (R. 16).  At the time of the

Hearing he was 12 years old and in sixth grade at the School of

Expressive Arts and Learning ("Expressive Arts")(R. 28-29).

### Medical and School History

Sean's mental health history includes diagnoses of ADHD,

anxiety disorder, pervasive developmental disorder and

oppositional defiant disorder, in addition to the identification

of Asperger syndrome traits (R. 48, 936, 1037).  Sean's medical

history includes diagnoses of allergies, gastritis, von

Willebrand disease (a bleeding disorder), compulsive overeating,

hypogonadism and sleep apnea (R. 23, 47, 54, 58, 718, 737-39,

936, 1128-29).

---

[3] Because she does not possess an M.D. degree, this opinion
refers to her simply as "O'Brien"--not to denigrate her degree,
but to distinguish her from medical practitioners.

Sean first began taking ADHD medication in first grade (R. 43).  After expressing suicidal thoughts in February 2006, Sean was admitted to Children's Memorial Hospital ("Children's") in March 2006 (R. 43, 724, 936).  In March 2007--after reportedly threatening to bring a gun to school--he entered the inpatient psychiatric unit at Children's and then attended the partial hospitalization program, with treatment focused on coping skills and expressing feelings (R. 936, 938, 942, 943).

Sean has also received ongoing individual and group therapy and psychiatric treatment at Children's, including individual sessions with licensed clinical social worker Marena Sabo ("Sabo") until February 2008 (R. 1025-55, 1072-75).  Sabo observed improvement between December 2007 and February 2008:  In December she noted severe symptoms of impulsivity and moderate symptoms of inattention, hyperactivity and anxiety (R. 1073), while in a February evaluation ("Sabo Evaluation") she noted moderate symptoms of inattention and hyperactivity and mild symptoms of anger/explosivity and anxiety (R. 1053).  Sean was also attending group therapy once a week (R. 57-58).

At the end of July 2007 Sean had begun seeing psychiatrist Dr. Myra Kamran on a monthly to bimonthly basis (R. 47-48, 1037).  In February 2008 Dr. Kamran completed a questionnaire ("Kamran Questionnaire") describing Sean's diagnoses as pervasive developmental disorder, anxiety disorder and ADHD (R. 1037).  Dr.

Kamran opined that Sean exhibited symptoms that included impairment in impulse control, generalized persistent anxiety, persistent disturbances of mood or affect, seclusiveness or autistic thinking and maladaptive patterns of behavior (R. 1038). Dr. Kamran also opined that Sean exhibited marked limitations in four domains: (1) acquiring and using information, (2) attending and completing tasks, (3) interacting and relating with others and (4) caring for oneself (R. 1039-40).

Sean attended Emerson School ("Emerson") between 2001 and 2006, was briefly homeschooled in fourth grade, attended Lincoln School ("Lincoln") from 2006 to 2007 and was enrolled at Expressive Arts in 2007 (R. 42-43, 232-33). Emerson records show that he was below grade level in reading and writing, that he received  speech therapy and extra assistance with reading and that his teacher reported challenges in paying attention, interacting with peers and self care (R. 149-57).

Lincoln records report disciplinary problems, including threatening a staff member and students, possession of weapons, touching other students, inappropriate language and gestures and disruptive and disrespectful behavior (R. 969-71). As stated earlier, while at Lincoln Sean reportedly said that he would bring a gun to school (R. 942, 966). At Lincoln Sean received social work services and had an individualized education plan with math, reading and behavioral goals (R. 966, 997-99). In

October 2006 evaluations of Sean completed by his teachers Jen
Data ("Data") and Cheryl Ludwig ("Ludwig") reported that he had
trouble functioning in the domains of acquiring and using
information, attending and completing tasks, interacting and
relating with others and caring for oneself, but they also noted
that implementing a behavior plan and "chill-outs" (a behavioral
modification) had helped Sean improve in the interacting and
caring for oneself domains (R. 871-78).

After Lincoln staff determined that an alternative placement
was appropriate for Sean, he enrolled at Expressive Arts--a
school for children with behavioral challenges (R. 51, 964).
Since Sean enrolled there he has not been suspended or asked to
stay after school (R. 31).  School records there show that Sean
has an individualized education plan with reading and behavior
goals:  Within several months he made progress toward (and even
met) some goals, but he made no progress toward other goals (R.
1090-91, 1093).  In September 2007 teacher Barbara Meeters
("Meeters") observed (after Sean had been in her class for one
week) that Sean seemed "interested in learning and interacting
with others" and also noted areas for academic and behavioral
improvement (R. 1089).

Testimony at the Hearing

At the Hearing Sean testified about his medical symptoms
and his schooling.  Sean said that he is often hungry and eats a

lot and that he has experienced headaches, stomach pain and occasional nosebleeds (although not for some time)(R. 37, 39). Sean described feeling throbbing in his foot when something bad was happening, and he also described recent nightmares (R. 29-38).

Sean also testified that at Emerson he was seen as the "troublemaker king," by which he meant that he was blamed for making trouble even when not at fault (R. 34). Sean mentioned one friend at Emerson (R. 34). He said that he did not like Emerson but did like Lincoln (R. 33).

As for Expressive Arts, Sean testified that he liked his classes there and that his grades have been A's, B's and C's (R. 31, 34). Sean also discussed participating in physical education class and playing sports at Expressive Arts (R. 30, 40). Sean said that he sometimes has trouble concentrating on his homework, but he works on it anyway (R. 26).

Bauer related her perspective on Sean's emotional and social capabilities. According to Bauer, Sean is very immature for his age--he often acts more like a 6 year old than a 12 year old (R. 48). She said that Sean has few friends and has difficulty interacting with other children (R. 48-49, 56), that he has strong emotional reactions to stressful situations and that he often becomes withdrawn, moody and "mouthy" (R. 53). Bauer thought that group therapy had helped Sean work on his social

skills and that he needed to continue those sessions (R. 57).

Bauer also testified that Sean was now taking (1) Adderall daily (except in the summer) for ADHD and (2) sometimes a short-acting ADHD medication to help with concentration on homework (R. 44-45, 52). Bauer explained that she must remind him multiple times to brush his teeth, shower and perform other self-care tasks because he does not remember on his own (R. 56). Bauer also testified that she had to remind and push Sean to complete his homework (R. 56).

Bauer recalled that when attending Emerson Sean became withdrawn and would hide under his clothes (R. 43). Sean initially did well at Lincoln, but he began to argue with his teachers and to withdraw from teachers and students (R. 51). At Lincoln he stated an intent to harm himself (he wanted to jump in front of a bus) and others (he would bomb other students)(R. 51). Bauer said he felt comfortable at Expressive Arts because the other students were like him (R. 52).

Finally, medical examiner O'Brien testified, offering her opinion of Sean's level of impairment based on the evidence in the record (she had not personally examined him)(R. 60). She opined that although Sean's impairments did not meet or medically equal the listings (R. 61), he exhibited marked limitation in the attending and completing tasks domain (but not a severe limitation, because he took only one type of ADHD

medication and saw a psychiatrist only once every month or two)
(R. 61-63). O'Brien further opined that Sean exhibited a less
than marked limitation in the domains of interacting and
relating with others, caring for oneself and health and
physical well-being (R. 61-62). Finally, O'Brien opined that
Sean exhibited no limitation in the domains of acquiring and
using information and moving and manipulating objects (R. 61).

ALJ Kraybill's Decision

ALJ Kraybill found that Sean had not been disabled since
the date his application was filed (R. 13). To that end the
ALJ first applied Reg. §416.924(a) and found that Sean had not
engaged in substantial gainful activity at any time relevant to
the decision. Though the ALJ then went on to find that Sean
had the severe impairments of ADHD, anxiety disorder and
"possible developmental disorder,"[4] the ALJ concluded that Sean
did not meet or medically equal the listings enumerated in
App'x 1, Listing 112.11 (R. 16).

At the next step in the analysis, the ALJ found that
Sean's impairment or combination of impairments did not
functionally equal the listings. In that regard the ALJ found
a marked limitation in one domain (attending and completing

---

[4] As stated earlier, Sean has been diagnosed with pervasive
developmental disorder, which is abbreviated "PDD." It appears
that the ALJ misconstrued the initial "P" to mean "possible"
rather than "pervasive," or (as seems less likely) he may have
been expressing doubt about the diagnosis.

tasks), a less than marked limitation in four domains
(acquiring and using information, interacting and relating to
others, caring for oneself and health and physical well-being)
and no limitation in one domain (moving about and manipulating
objects).  Because that set of findings does not support
functional equivalence (R. 18-23), the ALJ determined that Sean
was ineligible for SSI disability benefits.

### Need for a Remand

Bauer contends that summary judgment or, in the
alternative, remand is warranted because the ALJ's decision is
not supported by substantial evidence in the record, because
the ALJ failed to give proper weight to the opinion of Sean's
treating psychiatrist and because the ALJ failed to consider
whether Sean met the listing for Autistic Disorders.  As the
ensuing discussion reflects, a remand is indeed called for due
to (1) errors in the ALJ's discussion of the treating
physician's opinion and (2) some additional errors as well.

### Treating Physician's Opinion

Bauer asserts that the ALJ failed to give proper weight to
the opinion of Dr. Kamran, Sean's treating psychiatrist.  As
described above, the Kamran Questionnaire stated the opinion
that Sean exhibited a number of symptoms and a marked
limitation in four domains.  Although the ALJ gave Dr. Kamran's
opinion "some weight" (an amorphous appraisal), he declined to

assign it controlling weight (R. 17).

Under Reg. §416.927(d)(2) the treating physician's opinion generally receives "more weight," and it receives "controlling weight" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." When controlling weight is not warranted, Commissioner must apply several factors--including the length, nature and extent of the treatment relationship, the frequency of examination, the opinion's supportability and consistency and the specialization of the examiner--to determine proper weight (Reg. §416.927(d)(2) through (6)).

Clifford v. Apfel, 227 F.3d 863, 870 (7th Cir. 2000) (internal quotation marks omitted) is typical of our Court of Appeals' repetitions of the requirement "that an ALJ must minimally articulate his reasons for crediting or rejecting evidence of disability." That minimal articulation standard is "very deferential" if the ALJ has fully considered the factors described in the preceding paragraph of this opinion (Elder v. Astrue, 529 F.3d 408, 415 (7th Cir. 2008)).

Commissioner has responded that the ALJ gave sufficient justification for applying less than controlling weight, citing the ALJ's view that Dr. Kamran's opinion was both (1) internally inconsistent and (2) inconsistent with the

12

record as a whole (R. 17-18).[5]  In an effort to show internal

inconsistency, the ALJ pointed to an evaluation that Dr. Kamran

also completed in February 2008 ("Kamran Evaluation")(R. 18).[6]

That evaluation rated Sean as having severe symptoms of

hyperactivity and impulsivity as well as moderate to severe

symptoms of inattention and oppositionality, while rating other

listed symptoms as clinically insignificant.  On that score the

ALJ emphasized that Dr. Kamran rated no symptom as "very

severe," but he did not explain why ratings of "severe" and

"moderate to severe" contradict the Kamran Questionnaire's

finding of marked limitations.  To the contrary, Reg.

§416.926a(e)(2)(i) defines a "marked limitation" as one that is

"more than moderate" but "less than extreme."  It is an

understatement to say that the ALJ did not "minimally

articulate" his reasoning.

As for the ALJ's assertion that Dr. Kamran's opinion is

_____

[5] Comm. Br. 7 argues that the opinion was not well-supported
by medical evidence, but the ALJ did not advance that reason for
discounting a treating physician's opinion, instead emphasizing
alleged inconsistencies.  That contention by Commissioner is ill-
considered, for this Court is limited to considering the reasons
given by the ALJ (Steele v. Barnhart, 290 F.3d 936, 941 (7th Cir.
2002)).

[6] In that respect the ALJ referred to Dr. Kamran's "most
recent psych evaluation," giving the date as February 2007 (R.
18).  That seems to be an obvious typographical error, for the
record does not include a February 2007 evaluation.  This opinion
assumes that the ALJ meant to cite the February 2008 evaluation,
which otherwise meets the ALJ's description.

inconsistent with other evidence in the record, the ALJ
referred to (1) school records from Lincoln and Expressive Arts
showing improvement and (2) records from Sean's therapy
provider.  First, despite the principle that an ALJ may not
"select and discuss only that evidence that favors his ultimate
conclusion" (Herron v. Shalala, 19 F.3d 329, 333 (7th Cir.
1994)), here the ALJ clearly offered an incomplete picture of
the school records that borders on mischaracterization.

For example, the ALJ emphasized that Lincoln records
(presumably the Data-Ludwig evaluation)[7] showed Sean's behavior
as having improved through medication, therapy and the use of
"behavior modifiers such as 'chill-outs'" (R. 18).  That was
accurate as far as it goes, but the ALJ failed to mention that
the principal part of the teachers' evaluation consisted of
their reports of serious ongoing behavioral and academic
problems.

In much the same way, the ALJ also highlighted a letter in
which Expressive Arts teacher Meeters praised Sean's
willingness to participate, but he omitted to mention that Sean
had been in Meeters's class for only one week at the time of
her letter (R. 1089).  Similarly, Sean's individualized
education plan records showed progress toward some goals at

---

[7] Although the ALJ did not offer a citation to the record,
he appeared to be referring to the Data-Ludwig October 2006
evaluation described in the Factual Background (R. 871-78).

Expressive Arts, but they also show that he has not progressed toward other goals (R. 1090-91, 1093).

Hopgood v. Astrue, 578 F.3d 696, 700 (7th Cir. 2009) recently criticized an ALJ's "fail[ure] to explain why he did not credit portions of the record that were favorable to" the claimant--in that instance, teachers' reports of serious ongoing problems at school. Here the ALJ's selective cherrypicking of excerpts from the record is richly deserving of like criticism.

So much for the ALJ's determination that Dr. Kamran's opinion was "inconsistent with the record as a whole," which does not survive analysis at each step on the way. And to turn to the ALJ's finding that Dr. Kamran's opinion is inconsistent with the opinion of Sean's therapist,[8] that overstates the effect of differing evaluations of the same evidence.

It is true that therapist Sabo observed improvement, and the Sabo Evaluation noted moderate symptoms of inattention and hyperactivity and mild symptoms of anger/explosivity and anxiety (R. 1053). That differs (1) from the ratings in the Kamran Evaluation, which used the same evaluation form and was

---

[8] In that regard the ALJ did not say which therapist he had in mind. While B. Mem. 9 assumes that he meant the therapists who led Sean's group therapy sessions, C. Mem. 8 contends that the ALJ actually referred to Sabo. This Court agrees that the evidence to which the ALJ referred appears to correspond to Sabo's notes--and the text discussion proceeds on that basis.

completed at roughly the same time but noted more severe symptoms, and (2) from the ratings in the Kamran Questionnaire.

But facial differences between two evaluations do not necessarily add up to inconsistency. For example, in Boiles v. Barnhart, 395 F.3d 421, 426 (7th Cir. 2005), two physicians offered differing estimates of the frequency of the claimant's seizures, but our Court of Appeals did not view that deficiency as an inconsistency; and see also such cases as Bauer v. Astrue, 532 F.3d 606, 609 (7th Cir. 2008), also faulting an ALJ for an overly picky finding of inconsistency. Without a more persuasive explanation, the ALJ is certainly not entitled to reject Dr. Kamran's opinion--that of a licensed psychiatrist based on extensive treatment--because it does not jibe with social worker Sabo's view.[9]

Moreover, even if this Court were to consider that the ALJ had adequately articulated his finding that controlling weight was not warranted for Dr. Kamran's opinion (as he did not), the

---

[9] Comm. Mem. 7 also seeks to argue that Dr. Kamran's opinion is inconsistent with the opinions of Social Security Administration evaluators who assessed Sean based on his medical and school records. In January 2007 a psychologist concluded that Sean had a marked limitation in one domain (attending and completing tasks) but that the limitations did not meet or functionally equal a listing (R. 929-34), and in June 2007 a psychologist and medical doctor reached the same conclusion (R. 1002). But the ALJ did not cite those opinions as inconsistent with Dr. Kamran's--and as earlier noted in n.5, such cases as Steele, 290 F.3d at 941 teach that it is improper to go beyond the ALJ's stated reasons.

ALJ has plainly failed his obligation to apply the regulatory factors outlined in Reg 416.927(d)(3) through (6) to determine what weight <u>was</u> warranted. All the ALJ said was that Dr. Kamran's opinion warrants "some weight" (R. 17)--a pronouncement that sheds no real light on how influential the ALJ found her opinion. Instead the ALJ appears to have decided without analysis that Sabo's opinion prevails over Dr. Kamran's. But <u>Moss v. Astrue</u>, 55 F.3d 556, 561 (7th Cir. 2009)(per curiam) teaches that an ALJ must apply the regulatory factors even before crediting one <u>treating physician</u>'s opinion over another's--and in this case social worker Sabo's opinion is not entitled to "more weight," as a treating physician's is under the Regulations.[10]

All of the ALJ's several missteps as to Dr. Kamran's opinion are not merely harmless errors--rather, they compound other flaws in the decision. At times it seems pretty plain that the ALJ afforded the treating physician's opinion no weight at all. For example, the ALJ ignored Dr. Kamran's opinion in concluding that Sean does not meet or medically

---

[10] In that regard Sabo's opinion could not qualify for "more weight" or "controlling weight" under the treating-physician rule--that rule applies only to "treating sources," defined as the claimant's "own physician, psychologist, or other acceptable medical source" (Reg. §416.902). "Acceptable medical source" includes "licensed physicians and licensed or certified psychologists" (Reg. §416.913(a))--but not therapists (the category into which Sabo fits), who are instead designated as "other sources" (Reg. §416.913(d)(1)).

equal the listing for ADHD (R. 16), a conclusion for which the ALJ cited no evidence at all and provided no explanation or analysis.

That contrasts sharply with the Kamran Questionnaire, which lists several symptoms directly relevant to the listing--including hyperactivity, impairment in impulse control, difficulty thinking or concentrating and intense and unstable interpersonal relationships.[11]  Regrettably, the ALJ's failure to discuss Dr. Kamran's opinion--and his failure to offer any analysis of the listing--equates to the impermissible specter of an ALJ "playing doctor," a phenomenon too often encountered and criticized by our Court of Appeals and by District Courts as well.

That same problem is manifested again in the ALJ's discussion of Sean's limitations in the domains of functioning. For the acquiring and using information domain, the ALJ appears to have given Dr. Kamran's opinion no weight at all, asserting that "[t]here is no evidence to support a greater finding of limitation" (R. 19).  That is dead wrong:  Dr. Kamran found

_____

[11] In that regard the listing requires (1) medically documented findings of marked inattention, impulsiveness and hyperactivity and (2) a marked impairment in at least two of the following:  (a) cognitive communicative functions, (b) social functioning (c) personal functioning and (d) maintaining concentration (App'x 1, Listing 112.11 and 112.02).

that Sean has a marked limitation in that respect.[12]  And that
error compounds another flaw in the ALJ's discussion of that
domain--his reliance on Expressive Arts records that Sean is
"progressing in school appropriately" (R. 19).  But that
selectively highlights portions of Sean's school records,
rather than weighing the evidence--an approach that our Court
of Appeals soundly disapproves (again see Hopgood, 578 F.3d at
699-700).

And there is more:  In discussing the caring for oneself
domain, the ALJ again did not cite or refer to Dr. Kamran's
opinion.  Instead the ALJ focused solely on personal hygiene
and credited the medical examiner's testimony that Sean's
inattention to hygiene is typical for a 12 year old boy (R.
23).  But as Reg. §416.926a(k)(1) specifies, that domain covers
a whole group of capabilities other than hygiene, including
identifying and regulating feelings, age-appropriate "feeding,"
employing age-appropriate coping strategies and making safe
decisions.  Thus Dr. Kamran's finding of a marked limitation
and his identification of symptoms such as impairment in
impulse control, pathological dependence and appetite

---

[12] Other record evidence--including Sean's special education
goals focused on reading improvement--is also pertinent but not
discussed by the ALJ.

disturbance are relevant to that domain.[13]   All that too cannot
be excused as harmless error.

Additional Errors

This opinion might well end at this point, for the ALJ's
major failures to apply properly the treating-physician
standard, plus the degree to which those failures compound
other flaws in his decision, more than suffice to compel
remand.  But because those deficiencies do not tell the whole
story of the ALJ's shortfall, some other errors are worthy of
mention.

First, Bauer contends that the ALJ erred in failing to
consider whether Sean meets, medically equals or functionally
equals Listing 112.10, Autistic Disorder and Other Pervasive
Developmental Disorders.  As Bauer points out, the record
contains evidence that Sean exhibits symptoms of autism and
Asperger's syndrome.[14]  Although the evidence of autism is not
definitive, the record solidly establishes Sean's diagnosis of
pervasive developmental disorder.  As that disorder is also
covered by Listing 112.10, Commissioner should consider that

---

[13] And other pieces of evidence--such as Sean's threat to
bring a gun to school, his tendency to overeat and his
difficulties in coping with emotions–-are also pertinent but not
mentioned by the ALJ.

[14] Lincoln records cite autism as the basis for special
education eligibility (R. 981, 986, 988-89), and Bauer testified
that Sean's doctors identified Asperger's traits (R. 48)

listing on remand.

Second, the ALJ's credibility determination warrants comment.  Here is what the ALJ said at R. 18:

> [T]he statements concerning the intensity, persistence and limiting effects of the claimant's symptoms are not credible to the extent they are inconsistent with finding that the claimant does not [functionally equal the listings].

Proper credibility determinations receive deference, but--as our Court of Appeals regularly emphasizes (see, e.g., <u>Giles ex rel. Giles v. Astrue</u>, 483 F.3d 483, 488 (7th Cir. 2007), and most recently <u>Villano</u>, 556 F.3d at 562)--the ALJ must justify and explain such determinations.  <u>Giles</u>, 483 F.3d at 488, quotes the guidelines from Social Security Ruling 96-7p:

> The [credibility] determination or decision must contain specific reasons for the finding on credibility, supported by evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

It is plain that the ALJ's perfunctory credibility assessment does not meet those guidelines.  First, it is not clear to whose "statements" the ALJ referred--he mentioned Bauer's hearing testimony but did not mention Sean's at all in that section.  And he gave no explanation as to why he disbelieved the statements.

Moreover, the ALJ also failed to explain the weight given to the statements.  <u>Parker v. Astrue</u>, 597 F.3d 920, 921-22 (7th Cir. 2010) recently criticized an ALJ for using "meaningless

boilerplate" in describing that weight.[15]  Just so here--the

ALJ's pronouncement that the statements "are not credible to the

extent they are inconsistent with the finding that the claimant

does not [functionally meet the listings]" shed no light on the

actual weight afforded to the statements.

<u>Conclusion</u>

This opinion has had to recite at distressing length why

Commissioner's decision must be reversed and remand must be and

is granted under sentence four of Section 405(g) (see <u>Melkonyan</u>

<u>v. Sullivan</u>, 501 U.S. 89, 97-102 (1991)) for:

1.  a sufficient analysis of the weight that should be

accorded to Dr. Kamran's opinion as that of the treating

physician;

2.  a full assessment of whether Sean meets or

medically equals the listings, taking into account the

treating physician's opinion as appropriate and considering

both Listings 112.10 and 112.11;

3.  a full assessment of functional equivalence (if

Sean is not deemed to meet or medically equal a listing),

taking into account the treating physician's opinion as

appropriate, and fully considering all relevant factors for

each domain, especially the factors not considered (as

---

[15]  There the offending phrase was "not entirely credible"
(<u>id</u>.).

22

described above) in the decision's analysis of the "caring
for oneself" domain; and

      4. a more comprehensive credibility determination.
Remand is appropriate because the ALJ's decision's errors lay in
his failure to offer "adequate discussion of the issues"
(<u>Villano</u>, 556 F.3d at 562), while the record does not permit
ruling in Bauer's favor as a matter of law. Hence the parties'
cross-motions for an ultimately dispositive summary judgment on
the merits are denied.

      This Court is well aware that it cannot order Commissioner
to assign the case to another ALJ on remand. But the errors here
were so numerous and so pervasive that the second look on remand
would appear to call for a fresh pair of eyes.[16] In comparable
situations our Court of Appeals has found it appropriate to urge
reassignment on remand on a number of occasions (see, e.g., <u>Terry
v. Astrue</u>, 580 F.3d 471, 478 (7th Cir. 2009)(per curiam) and
cases cited there), and this Court does the same here.

                        *Milton D. Shadur*
                           Milton I. Shadur
                           Senior United States District Judge
Date: August 11, 2010

--------

[16] This should not be mistaken as reflecting this Court's
view that the same ALJ might intentionally resolve the issues in
the same way as before. It is rather a recognition of the human
inclination (even subliminally) to seek to justify one's own
decisions when they have been challenged, so that the scales
might be tipped (even unintentionally) on remand to the same ALJ.